UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| | | |
|---|---|---|
| NORTH AMERICAN SPECIALTY INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | No. 7:17-CV-159-REW-EBA |
| v. | ) ) ) | OPINION AND ORDER |
| MASONRY BUILDER'S OF KY, INC.,[1] et al., | ) ) | |
| Defendants. | ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

Plaintiff North American Specialty Insurance Company ("NAS"), moving for summary judgment, seeks indemnification from Defendants Masonry Builder's of KY, Inc. ("Masonry") and Masonry's owners/guarantors, Tim and Rontona Mitchell (collectively, "Defendants"). DE #16. Having thoroughly analyzed the record and DE #16's full briefing, for the reasons that follow, the Court GRANTS the motion on the terms of this Order.

Masonry needed bonding capacity to qualify for a particular contract. NAS signed on as surety, facilitating the project, but Masonry (and its individual owners) induced NAS by entry of a broad General Indemnity Agreement in NAS's favor. That Agreement gave NAS much authority with respect to and protection regarding any underlying bond claim. Masonry and the Mitchells cavil over NAS's handling, but the Indemnity Agreement puts them squarely on the hook for NAS's bond payments and resulting legal expenses.

---

[1] The Court uses the style name. The Bond and General Indemnity Agreement have no apostrophe in the name Masonry Builders.

1

## I. FACTUAL AND PROCEDURAL BACKGROUND

In May 2013, NAS, a licensed surety, issued payment and performance bond #2171269 (the "Bond") to cover Masonry's contract with Morgan County Real Properties I for construction of the Morgan County Wellness and Youth Center (the "Youth Center"). DE #1 ¶¶ 2, 8; *see* DE #1-1 (Bond). Payment bonds serve to ensure that subcontractors and vendors have recourse if the bonded contractor fails to pay them for project goods or services; performance bonds guarantee payment for the balance necessary to complete the project, should the contractor fail to do so. Sureties often logically condition bonding upon execution of an agreement indemnifying the surety in the event of the contractor's default under the bond. Accordingly, as required to obtain the Bond, Masonry and personal indemnitors Tim and Rontona Mitchell executed a General Indemnity Agreement ("GIA") agreeing to indemnify and hold NAS harmless from any "Loss" relative to the Bond. DE #1 ¶ 9; *see* DE #1-2 (GIA) ¶ 2.[2]

Masonry won the contract for brick work on the Youth Center. The defense tendered various unauthenticated contract documents suggesting that an unauthorized change by the Owner inserted an alternative brick product into the mix. That alternative, supplied by Hinkle Block and Masonry, LLC ("Hinkle"), is at the root of this dispute. Masonry contended the Owner should have paid for the difference in materials and costs, but Hinkle looked to Masonry. When Masonry refused payment, Hinkle submitted to NAS a claim for $66,596.23 against Masonry's Bond. DE #1 ¶ 11. NAS initially refused payment on the claim, so Hinkle brought suit against Masonry, NAS, and NAS's affiliate Washington International Insurance Company ("Washington") (which the GIA includes in its denomination of "Surety[,]" *see* DE #1-2 at 1). DE #1 ¶ 12. *See Hinkle*

---

[2] The Bond is organized by section, while the GIA is organized by paragraph. The Court references the subparts of each document in accordance with its given structure.

*Block & Masonry, LLC v. Masonry Builder's of KY, Inc., et al.*, Morgan County Civil Action No. 15-CI-00141; DE #18-3 (*Hinkle* Complaint).

The *Hinkle* litigation involved various claims, including a breach of contract claim against Masonry, a claim for breach of the Bond against NAS and Washington, and bad faith claims against NAS and Washington. DE #18-3 ¶¶ 15–38. NAS alleges that it "continually urged" Masonry to settle the *Hinkle* claims, which Masonry denies, and the litigation persisted for over two years. DE #1 ¶ 14; DE #7 ¶ 11. In July 2017, NAS, allegedly "with the full cooperation and consent of Masonry," reached a settlement in the *Hinkle* action and paid Hinkle $64,958.25 to resolve all claims against NAS, Masonry (without prejudice), and Washington. DE #1 ¶ 15. Masonry adds that this settlement resulted in bad faith claim dismissal *with* prejudice. The order dismissed the contract claim against Masonry without prejudice, and NAS, as surety, took an assignment of that claim. *See* DE #18-5 (Agreed Order of Dismissal).

Then, NAS sought reimbursement from Masonry for all expenses incurred in defending and settling the *Hinkle* litigation. NAS filed a UCC financing statement securing NAS's interest in Masonry's assets and demanded payment from Masonry via letter. DE #1 ¶¶ 18–20; DE ##1-3, 1-4. Masonry steadfastly refused payment, and NAS initiated this action to recover the requested sums. NAS asserts three counts against Masonry: (1) breach of the GIA; (2) breach of the implied contractual duty of good faith and fair dealing; and (3) common law indemnity for the sum paid to Hinkle, $64,958.25, as well as any expenses and attorney fees incurred in litigating the *Hinkle* case. DE #1 ¶¶ 22–38. NAS additionally requests reimbursement for the costs of bringing this action to enforce the GIA, including reasonable attorney fees. *Id.* at 8.

NAS moves for summary judgment, seeking $105,444.92 in damages, plus ongoing legal fees. DE #16 at 1, 10. As required by the GIA, NAS has attached what it deems "[a]n itemized

statement of payments made by the Surety, sworn to by an officer of the Surety[,]" which the GIA designates as "prima facie evidence of the liability of the Indemnitors to reimburse the Surety." DE #1-2 ¶ 9; *see* DE #16-1 (Affidavit of Bryan Seifert). Defendants responded to the summary judgment motion (DE #18), and NAS replied (DE #22).

The Court makes certain observations about the record. First, NAS does not discuss the merits of Counts II and III, so the Court does not address those claims. Second, Masonry tendered various documents in response but authenticated none. Further, Masonry offered no affidavit to rejoin the factual claims of the Seifert Affidavit. The Court can process only what the record properly contains and so goes forth to resolve the motion.

## II. ANALYSIS

### A. Summary Judgment Standard

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A reviewing court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). "The moving party bears the burden of showing the absence of any genuine issues of material fact." *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008). The movant may satisfy this burden by demonstrating that "after reviewing the record as a whole a rational factfinder could not find for the nonmoving party." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998). In evaluating a summary judgment motion, a district court must avoid "credibility judgments and weighing of the evidence," *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th

Cir. 2005), and view "the facts and any inferences that can be drawn from them . . . in the light most favorable to the non-moving party," *id.* (citing *Matsushita*, 106 S. Ct. at 1356).

If the moving party meets its burden, the burden then shifts to the nonmoving party to produce "specific facts" showing a "genuine issue" for trial *Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2253 (1986); *Bass v. Robinson*, 167 F.3d 1041, 1044 (6th Cir. 1999). The nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 106 S. Ct. at 1356. The nonmovant "has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001). Summary judgment is particularly appropriate in a contract action, if the questions are primarily legal rather than factual, and "the documents and/or evidence underlying the contract are undisputed and there is no question as to intent." *Terry Barr Sales Agency, Inc. v. All-Lock Co., Inc.*, 96 F.3d 174, 179 (6th Cir. 1996). Where the contract language is ambiguous, however, disputed fact issues as to intent preclude summary judgment. *Id.*; *see also Parrett v. American Ship Building Co.*, 990 F.2d 854, 858 (6th Cir. 1993).

B. **Validity and Enforceability of the GIA**[3]

Questions governing "the construction and interpretation of a contract"—including whether the contract's terms are ambiguous—"are questions of law to be decided by the court[.]" *Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 105 (Ky. 2003) (quoting *First Commonwealth Bank*

---

[3] "Federal courts sitting in diversity generally apply federal procedural rules and the substantive law of the forum state." *Rupert v. Daggett*, 695 F.3d 417, 423 (6th Cir. 2012) (citing *City of Cleveland v. Ameriquest Mortg. Sec., Inc.*, 615 F.3d 496, 502 (6th Cir. 2010)); *see also Kepley v. Lanz*, 715 F.3d 969, 972 (6th Cir. 2012) ("In diversity cases, a federal court must rely upon the substantive law of the forum state.") This case is before the Court on diversity jurisdiction, and the parties assume Kentucky law applies to the substantive contractual dispute at issue.

5

*of Prestonsburg v. West*, 55 S.W.3d 829, 835 (Ky. Ct. App. 2000)); *accord Zetter v. Griffith Aviation, Inc.*, 435 F. Supp. 2d 622, 628–29 (E.D. Ky. 2006). The Court's "review must begin with an examination of the plain language of the instrument." *Ky. Shakespeare Festival, Inc. v. Dunaway*, 490 S.W.3d 691, 694 (Ky. 2016). "In the absence of ambiguity, a written instrument must be enforced strictly according to its terms[.]" *Wehr Constructors, Inc. v. Assurance Co. of Am.*, 384 S.W.3d 680, 687 (Ky. 2012) (quoting *Frear*, 103 S.W.3d at 106).

"A contract of indemnity is an obligation or duty requiring a promisor . . . to make good any loss or damage which another has incurred while acting at the request or for the benefit of the promisor." *Intercargo Ins. Co. v. B.W. Farrell, Inc.*, 89 S.W.3d 422, 426 (Ky. Ct. App. 2002). An indemnification agreement accompanying a performance or payment bond in the construction industry is a "prime example" of such a contract. *Id.* In Kentucky, "[t]he right of an indemnitee to recover of the indemnitor under a contract of indemnity according to the terms of such a contract is well recognized." *U.S. Fid. & Guar. Co. v. Napier Elec. & Constr. Co.*, 571 S.W.2d 644, 646 (Ky. Ct. App. 1978). Further, "[s]uch a contract is not against public policy and will be enforced if the indemnitee has suffered loss thereunder and has complied with its terms." *Id.*; *accord Thompson v. The Budd Co.*, 199 F.3d 799, 807 (6th Cir. 1999) (finding that an indemnitor's liability is "determined by the provisions of the indemnity agreement itself").

Defendants do not contend that the GIA is ambiguous, or that its terms are subject to different interpretations. Indeed, the Court finds that the relevant, operative language is not ambiguous. *See Ky. Shakespeare Festival*, 490 S.W.3d at 694–95. To the extent Defendants contest the validity of the GIA itself, they argue that: (1) as a general matter of public policy, "Kentucky law disfavors contracts [] calling for indemnification for the actions of the indemnitee"; and (2) specifically, this GIA provides for indemnification for costs "related, at least in part, to

6

[NAS's] own claimed wrongful conduct," rendering it an "[e]xculpatory contract[] . . . highly disfavored under Kentucky law[.]" DE #18 at 5. The argument hinges on the fact that Hinkle sued both Masonry and the sureties. The claims against NAS included an extra-contractual theory. Thus, per Masonry, NAS spent money and incurred loss for its own alleged improper conduct relative to claim adjustment.

### a. The GIA Does Not Violate Public Policy

Defendants offer no real support for their first proposition, which is contrary to Kentucky precedent. Kentucky law does not disfavor, nor does it discriminate against, indemnity agreements. *See U.S. Fid. & Guar. Co.*, 571 S.W.2d at 646; *see also Enerfab, Inc. v. Ky. Power Co.*, 433 S.W.3d 363, 366 (Ky. Ct. App. 2014) (noting that "general principles of contract construction apply equally to indemnification agreements" and agreeing with the *U.S. Fid. & Gaur. Co.* court that "[s]uch a contract is not against public policy[.]"); *accord Nat. Sur. Corp. v. People's Mill. Co.*, 57 F. Supp. 281, 282 (W.D. Ky. 1944) ("The right of an indemnitee to recover of the indemnitor under a contract of indemnity according to the terms of such a contract is well recognized. Such a contract is not against public policy and will be enforced if the indemnitee has suffered loss thereunder and has complied with its terms."). Defendants proffer no authority to cast doubt upon this longstanding precedent, and consequently, the Court disposes of Defendant's first challenge to the GIA.

The central purpose of the GIA is protection of NAS against "Loss." The key provisions include:

> The Indemnitors shall exonerate, hold harmless and indemnify the Surety from and against any and all Loss. For the purpose of this Agreement, Loss means any liability, loss, costs, damages, attorneys' fees, consultants' fees, and other expenses, including interest, which the Surety may sustain or incur by reason of, or in consequence of, the execution of the Bonds (or any renewals, continuations or extensions). Loss includes but is not limited to the. following: (a) sums paid or

7

> liabilities incurred in the settlement of claims; (b) expenses paid or incurred in connection with the investigation of any claims; (c) sums paid in attempting to procure a release from liability; (d) expenses paid or incurred in the prosecution or defense of any suits; (e) any judgments under the Bonds; (f) expenses paid or incurred in enforcing the terms of this Agreement; (g) sums or, expenses paid or liabilities incurred in the performance of any Bonded contract or related obligation; and (h) expenses paid in recovering or attempting to recover losses or expenses paid or incurred. Loss expressly includes attorney fees incurred in defending claims . . . [and] seeking recovery under the terms of this Agreement from the Indemnitors[.]

DE #1-2 ¶ 2.

> The Surety shall have the right to decide and determine in its sole discretion whether any claim, liability, suit or judgment made or brought against the Surety or any of the Indemnitors on any Bond shall or shall not be paid, compromised, resisted, defended, tried or appealed, and the Surety's decision shall be final, binding and conclusive upon the Indemnitors. The Surety shall be entitled to immediate reimbursement for any and all Loss under this Agreement . . . An itemized statement of payments made by the Surety sworn to by an officer of the Surety shall be prima facie evidence of the liability of the Indemnitors to reimburse the Surety.

*Id.* at ¶ 9. NAS resolved the *Hinkle* claim and now seeks to recover what it paid and other related Loss from the GIA Indemnitors.

### b. The GIA Is Not an Exculpatory Agreement

Defendants creatively (if unpersuasively) liken the GIA to the "exculpatory" preinjury release invalidated in *Hargis v. Baize*, 168 S.W.3d 36 (Ky. 2005). An exculpatory contract is one that seeks to release the drafter from liability for his or her own wrongful conduct. "An exculpatory contract for exemption from future liability for negligence, whether ordinary or gross, is not invalid per se." *Hargis*, 168 S.W.3d at 47. "However, such contracts are disfavored and are strictly construed against the parties relying upon them." *Id.* (citing *City of Hazard Mun. Hous. Comm'n v. Hinch*, 411 S.W.2d 686, 689 (Ky. 1967)). The exculpatory language "must be 'so clear and

understandable that an ordinarily prudent and knowledgeable party to it will know what he or she is contracting away; it must be unmistakable.'" *Id.* (citation omitted). [4]

The *Hargis* court analyzed the validity of a preinjury release purporting to exonerate a lumber mill employer for its own future negligence. The at-issue release, between the mill and an independent contractor it hired, attempted to absolve the mill of any liability for the contractor's personal injuries while working, even those resulting from the mill's own negligence. *Id.* The court invalidated the "exculpatory" preinjury release because it failed to mention the word "negligence" and "d[id] not explicitly release [the mill] from liability for personal injury caused by [its] own conduct." *Id.* The court reasoned that an ordinarily prudent party would not have realized he was contracting away his right to hold the mill accountable for its own negligent conduct. *Id.*

NAS fairly asserts that the circumstances and facts of *Hargis*, involving a preinjury release purporting to exonerate the drafter from personal injury liability for its own future negligence, are inapposite. DE #22 at 2. Defendants do not allege that NAS was negligent toward them in this matter or the underlying *Hinkle* litigation, or that NAS ever sought to absolve itself of liability for future negligence. But Defendants' argument is more nuanced, analogizing the *Hargis* mill's attempt to avoid liability for its own negligent acts via preinjury release with NAS's attempt to avoid liability for its own bad faith conduct via the GIA.[5] *See* DE #18 at 5–6. Defendants argue

---

[4] *Cf. Budd Co.*, 199 F.3d at 808–09 (discussing *Fosson v. Ashland Oil & Ref. Co.*, 309 S.W.2d 176, 178 (Ky. 1958) and finding, based on the *Fosson* court's refusal "to require a specific statement to the effect that indemnity 'include[s] the owner's own negligence[,]'" that a construction bid contract's indemnity provision included indemnification for the company's own negligence).

[5] Defendants contend that NAS seeks indemnification for not only its own wrongful conduct, but additionally that of Washington International Insurance Company ("Washington International"), against whom Hinkle also lodged a bad faith claim. Defendants argue that "[t]here is no contract between the Defendants and Washington National [sic]." DE #18 at 6. The Court rejects this contention as foreclosed by the plain language of the GIA, which denominates Washington International as one of the "affiliates, subsidiaries, divisions, successors, assigns, co-sureties, or

that NAS's attempt to seek indemnity for its settlement of the bad faith claims against it in the *Hinkle* litigation is functionally an attempt to exculpate itself for its own wrongdoing, and, as such, per *Hargis* the language of the GIA must unmistakably state that NAS would be absolved of liability for its own bad faith for the GIA to be enforceable in that regard. *Id.* Defendants contend that the language of the GIA does not unequivocally exculpate NAS for its own bad faith conduct, and accordingly, it is invalid and unenforceable to that extent.

Defendants do not pinpoint which provisions of the GIA allegedly contemplate exonerating NAS for its own wrongdoing, and the Court notes the only two potential candidates: ¶¶ 2 and 9. *See* DE #1-2. Paragraph 2 essentially provides that Defendants will indemnify NAS for any and all losses incurred in investigating and settling claims related to the Bond. The broad scope of the language in this provision encompasses indemnification for *all* claims resulting in loss to NAS, including those against NAS itself, provided the loss was "by reason of, or in consequence of" NAS's execution of the Bond. *Id.* at ¶ 2. Paragraph 9 reinforces this broad reading, stating that "[t]he Surety shall have the right to decide and determine in its sole discretion whether any claim, liability, suit, or judgment *made or brought against the Surety* or any of the Indemnitors on any Bond shall or shall not be paid." *Id.* at ¶ 9 (emphasis added). Clearly, reading these provisions together, the GIA contemplates Masonry categorically indemnifying NAS for claims brought against NAS itself, provided they arise out of the Bond.

Underlying Defendants' argument that the GIA is exculpatory is the supposition that the filing of a bad faith claim against a bonding surety evinces some level of culpability or wrongdoing

---

reinsurers" included under the umbrella term "Surety" as used throughout the GIA. DE #1-2 at 1. Accordingly, for all practical purposes in this case and in the underlying *Hinkle* litigation, the Court treats NAS and Washington International as a singular entity. The state complaint lacked distinct substance as to Washington.

on the part of the surety. *See, e.g.*, DE #18 at 6 (noting the absence of language in the GIA unmistakably exculpating NAS for "[its own] intentional and/or wrongful conduct . . . as would be implicated where the bond company has been sued for bad faith.").[6] This assumption is required, if following the logic of the theory, to bring the GIA within *Hargis*'s "exculpatory" ambit and trigger the attendant heightened clarity requirements that Defendants argue apply; otherwise, NAS would not have any wrongdoing from which to seek exculpation.

The suggested analogy is untenable in view of a bonding surety's posture on behalf of the principal and the plain language of the Bond itself. NAS's duty to Defendants, as bonding surety, necessarily entailed refusing (at least pending evaluation) a claim against the Bond, if NAS reasonably believed an adequate defense existed. *See, e.g.*, *Niagara Fire Ins. Co. v. Bryan & Hewgley, Inc.*, 195 F.2d 154, 156 (6th Cir. 1952) (quoting *South. Sur. Co. v. Motlow*, 61 F.2d 464, 468 (6th Cir. 1932)) (affirming an insurer's "right to refuse to pay a claim so long as it has reasonable grounds to believe that it has a meritorious defense"); *South. Sur. Co.*, 61 F.2d at 468 (finding that "there was not sufficient evidence of a vexatious refusal to pay" where the insurer was reasonably justified in asserting its defense). It is unsurprising that Hinkle disputed the adequacy of NAS's defense and deemed the refusal to pay unreasonable, giving rise to the bad faith claims. *See, e.g.*, DE #18-3 at ¶ 34 (in its complaint, Hinkle alleged that "NAS lacks a

---

[6] The Court observes that the notion of ascribing wrongdoing to NAS as a result of the bad faith claims in the *Hinkle* litigation is at odds with Defendants' other arguments. In defense to NAS's indemnity claim, for example, Defendants argue NAS's unreasonableness in allegedly prematurely settling the *Hinkle* claims, despite what Defendants deemed an adequate defense. DE #18 at 8. The bad faith claims against NAS and Washington International in the *Hinkle* action, however, focused on the obverse—the Surety's refusal to pay Hinkle the requested sum when Hinkle demanded it. *See* DE #18-3 at ¶¶ 26–38. It is difficult to reconcile Defendants' argument that NAS committed "wrongful conduct[]" by virtue of these bad faith claims being filed against it with Defendants' argument that NAS also acted improperly by not further refusing payment to Hinkle. Defendants wanted NAS to steadfastly refuse payment to Hinkle, *see* DE #18 at 8, but faults them for the action Hinkle unsurprisingly took in response, *see id.* at 5.

11

reasonable basis in law or fact for denying [Hinkle's] claim."). Indeed, Defendants do not dispute that a reasonable basis for NAS's refusal existed at the time—*see* DE #18 at 8—in fact, they contend that the defense still applies. *See id.* ("The [ongoing *Hinkle*] litigation, in fact, continues toward that end.").

Furthermore, the plain language of the payment Bond permits NAS to dispute or refuse payment on a claim where there exists a basis for refusal.[7] The Court cannot fault NAS for following the terms of the Bond. Unlike *Hargis*, a personal injury context involving important public policy limitations, Kentucky suretyship law offers longstanding protection to the freedom of contract and predictability interests in the construction and insurance markets. The owner requires the solvent surety to be in the mix, and the contractor promises broad indemnity to induce the surety to join. That occurred here. The GIA expressly was "an inducement to the Surety." DE #1-2 at 1. The Bond put NAS on the hook for Masonry's payment obligations, to wit: "The Contractor and the Surety . . . bind themselves . . . to the Owner to pay for labor, materials and equipment furnished for use in the performance of the Construction Contract." DE #1-1 at § 1.

The *Hinkle* claim may indeed have been or be debatable. Masonry posits that the new brick may have been an undocumented bid alternative and contends the Owner should have paid the difference. NAS let that defense play out over two years of litigation, but ultimately decided to resolve the *Hinkle* claim via mediation. As the Agreed Order shows, Masonry was in the loop on

---

[7] *See* DE #1-1 at §§ 6 and 6.1. These sections provide: "§ 6 When the claimant satisfies the conditions of Section 4 [outlining the method for making a claim against the Bond], the Surety shall promptly and at the Surety's expense take the following actions: § 6.1 Send an answer to the Claimant, with a copy to the Owner, within 45 days after receipt of the claim, stating the amounts that are undisputed, *and the basis for challenging any amounts that are disputed*." (emphasis added).

this development. It may disagree on the merits, but the Bond and GIA vest significant discretion in NAS on how to fulfill its Bond obligations. Again, to quote the instrument itself:

> The Surety shall have the right to decide and determine **in its sole discretion** whether any claim, liability, suit or judgment made or brought against any the Surety or any of the Indemnitors on any Bond shall or shall not be paid, compromised, resisted, defended, tried or appealed, and the Surety's decision shall be final, binding and conclusive upon the Indemnitors.

DE #1-2 ¶ 9 (emphasis added). To induce NAS's issuance of the Bond, Masonry agreed that NAS would have sole discretion in adjusting any Bond claim.

It would flip suretyship law on its head if a principal could use the surety's contracted discretion to then erode the strength of an underlying indemnity agreement. This is a world away from the *Hargis* notion of pre-conduct tort exoneration. The Court rejects the parallel. Instead, Kentucky law clearly endorses indemnity agreements such as the GIA as consistent with public policy. Further, Kentucky enforces such agreements as written. Finally, potential principal defenses do not thwart or modify operation of an indemnity agreement. *See Frontier Ins. Co. in Rehab. v. MC Mgmt., Inc.*, No. 3:06-CV-597-H, 2009 WL 541301, at *9–10 (W.D. Ky. Mar. 4, 2009) ( noting "rejection of the argument that indemnitors are not obligated to indemnify the surety for losses paid on payment bond claims if the owner of the project defaulted in its obligations to pay the contractor"), *aff'd sub nom. Frontier Ins. Co. in Rehab. v. RLM Const. Co.*, 468 F. App'x 506 (6th Cir. 2012). The GIA here does not purport to release NAS from prospective fault. Rather, it creates an ordered process for bond-claim resolution, one in which Masonry voluntarily contracted away its right to complain about NAS's adjustment decisions. Masonry may not induce the NAS role and then balk when that role operates as the documents permit.

## C. Defendants' Liability Under the GIA

Having concluded that the Bond and GIA are unambiguous, valid, and enforceable, the Court next must determine the extent of Defendants' duty to indemnify NAS under the GIA. The GIA provides that "[a]n itemized statement of payments made by the Surety sworn to by an officer of the Surety shall be prima facie evidence of the liability of the Indemnitors to reimburse the Surety." DE #1-2 at ¶ 9. NAS submitted the affidavit of Bryan Seifert, Vice President of Swiss Re Corporate Solutions, parent corporation of Westport Insurance Corporation, of which NAS is a specialty surety subsidiary. DE #16-1 at ¶ 2. That filing also contains a listing of payments purportedly made in consequence of NAS's liability under the Bond. *Id.* at 20–21. Pursuant to the terms of the GIA, Seifert's affidavit may qualify as prima facie evidence of Defendants' liability. *See, e.g.*, *Travelers Cas. and Sur. Co. of Am. v. Ream*, No. 07-171-DLB, 2009 WL 2969897, at *6 (E.D. Ky. Sept. 9, 2009); *U. S. Fid. & Guar. Co.*, 571 S.W.2d at 646 ("The provisions of an indemnity agreement that vouchers or other evidence of payments or an itemized statement of payments sworn to by an officer of the surety shall be prima facie evidence of the fact and extent of the liability of the indemnitor to the surety, and provisions that the indemnitor shall be liable for all liabilities, losses and expenses incurred by the surety and all sums paid by the surety in good faith under the belief that surety was or might be liable for said payments or that said payments are necessary and advisable to protect the surety's right or to avoid and lessen the surety's liability were not against public policy."); *id.* (enforcing full indemnity in context, "pursuant to the agreement"). However, the propriety of the amounts claimed, and accordingly the ultimate extent of Defendants' liability, is a more complex consideration.

1. **The *Hinkle* Settlement Was Reasonable and Reached in Good Faith**

The itemized statement identifies a $64,958.25 payment to Hinkle with the accompanying notation "Surety Loss Payment to Payment Bond Claimant," ostensibly representing the settlement value.[8] DE #16-1 at 21. In defense to NAS's claim for indemnification for this sum, Defendants assert that there is, at minimum, a genuine dispute over the reasonableness of the amount. DE #18 at 8. "If the surety or the indemnitee has the legal right to adjust or settle the claim . . . it is only necessary that such an adjustment or settlement be a reasonable one and made in good faith." *Transamerica Ins. Co. v. Bloomfield*, 401 F.2d 357, 362–63 (6th Cir. 1968) (quoting *Nat'l Sur. Corp. v. Peoples Milling Co.*, 57 F. Supp. 281, 282–83 (W.D. Ky. 1944). Provisions in indemnity agreements permitting sureties to settle claims on behalf of themselves and the contractors they have bonded,[9] and stating that "vouchers and other evidence of payment shall be prima facie evidence of the propriety thereof, have been upheld as not against public policy and enforced by the courts." *Id.* at 362. NAS is entitled to indemnity under the GIA. The record establishes that Hinkle made a claim for materials used in the Project. Seifert's Affidavit so provides, and Masonry's Response concedes that it used Hinkle's brick. *See* DE #18 at 2. There may have been a colorable defense related to bid and contract particulars, but NAS, following two years of litigation at Masonry's goading, determined to resolve the claim via mediation. Masonry knew this. The GIA vests discretion in NAS on bond adjustment, and NAS rationally determined to pay

---

[8] This number is consistent with the amount NAS provides in its Complaint. DE #1 at ¶¶ 15, 24, and 38. The amount is also consistent with the sum requested under the Bond by Hinkle in the underlying litigation. DE #18-3 at ¶ 25 (seeking $60,771 "plus finance charges, costs, and reasonable attorneys' fees.").

[9] Again, the GIA provides: "The Surety shall have the right to decide and determine in its sole discretion whether any claim, liability, suit or judgment brought against the Surety or any of the Indemnitors on any Bond shall or shall not be paid[.]. DE #1-2 ¶ 9.

the claim and terminate the bond liability. The Bond required payment for materials used in the construction contract.

A potential defense related to owner default does not affect a surety's ability to adjust a claim and does not impact the underlying indemnity claim, as long as the surety complied with the relevant contracts. *See Frontier*, 2009 WL 541301, at *9 (collecting cases concluding that a principal's asserted defense to paying a bond claimant does not affect the surety's right to indemnification from the principal). Here, Masonry points to nothing that would be contractual noncompliance by NAS. To the extent it seeks to label the *Hinkle* resolution as too expensive or the invested expenses excessive, Masonry contracted away those arguments when it entered a GIA of such breadth. It gave NAS "final, binding and conclusive" decisional power and the sole discretion to respond to and resolve Bond matters. Further, the GIA specifically placed claims against NAS, resulting from the Bond, within the indemnity umbrella and duty.[10]

For all of these reasons, and perceiving no legal impediment to operation of the GIA, the Court enforces it according to the plain terms of the contract. NAS is entitled to indemnity for the $64,958.25 *Hinkle* Bond claim.

**2. Defendants Are Liable for Reasonable and Necessary Attorneys' Fees**

**a. Fees Incurred in the *Hinkle* Litigation**

NAS seeks indemnification for attorney fees incurred in litigating the *Hinkle* claims. DE #1 at ¶ 38. The GIA provides NAS with the right to be reimbursed for attorney fees incurred in litigating claims against the Bond. DE #1-2 at ¶ 2. Accordingly, pursuant to the valid and enforceable GIA, NAS may collect attorney fees incurred "by reason of, or in consequence of the

---

[10] Again, Washington International is a named GIA party, so the Court rejects Masonry's sub-argument related to that affiliate.

Bond" from Defendants. In support of its request, and as required by the GIA (*id.* at ¶ 9), NAS tendered to the Court Bryan Seifert's Affidavit, accompanied by a listing of payments made. DE #16-1. The statement lists nineteen entries payable to Frost Brown Todd LLC, with the notation "Surety Payment to Surety Attorney" following each entry. *Id.* at 20–21. The net claim is for $72,444.92.

In Kentucky, attorney fees typically are recoverable in an indemnity action only if they are reasonable and were necessarily incurred. *See Middlesboro Home Tel. Co. v. Louisville & N.R. Co.*, 284 S.W. 104, 108 (Ky. Ct. App. 1926); *see also Chittum v. Abell*, 485 S.W.2d 231, 237 (Ky. Ct. App. 1972) (noting that "[a]ttorney fees reasonably incurred in the defense of the claim for damages may in appropriate circumstances be allowed in the judgment of indemnity for the damages[,]" depending "upon the equities of the situation[.]"). Determining the reasonableness of requested attorneys' fees is a consideration reserved for the Court,[11] based on a variety of factors, including the: (1) amount and character of the services; (2) labor and time involved; (3) nature and importance of the litigation; (3) responsibility imposed; (4) amount of money involved in the controversy; (5) skill and experience necessary to perform the services; (6) professional standing of the attorney(s); and (7) the result ultimately achieved. *See Mo-Jack Dist., LLC v. Tamarak Snacks, LLC*, 476 S.W.3d 900, 910 (Ky. Ct. App. 2015) (citing *Axton v. Vance*, 269 S.W. 534, 536–37 (Ky. 1925)).

Here, of course, the GIA broadly vests discretion in NAS, as this decision has noted repeatedly. NAS concedes that its sought expenses "must be reasonable and necessary to be recoverable here." DE #22 at 4. What NAS tendered is a table of payments made, backed up by

---

[11] *See Capitol Cadillac Olds, Inc. v. Roberts*, 813 S.W.2d 287, 293 (Ky. 1991) ("The trial judge is generally in the best position to consider all relevant factors and require proof of reasonableness from parties moving for allowance of attorney fees.").

the Seifert Affidavit. DE #16-1. He avers each payment in fact occurred and that each "was proper and consistent with the terms of the GIA. NAS acted in good faith in making such payments." *Id.* ¶ 12.[12] The GIA provides: "An itemized statement of payments made . . . shall be prima facie evidence of the liability of the indemnitors[.]" DE #1-2 ¶ 9.

The Court finds this record insufficient to support a judgment on the precise amount owed. NAS's purported "itemized statement" is really just a listing of undifferentiated totals. It has no more specificity, besides payment date, than NAS's pre-compromise demand letter seeking $47,000. *See* DE #18-4 at 2 ("Per the Indemnitors['] obligations under the GIA, NAS demands [Masonry and the indemnitors] reimburse NAS in the amount of $47,000 for attorneys' fees and costs incurred to date."). The Court is unable to discern the particular reason or purpose behind each payment and whether each involves only attorney fees or is another potential "Loss" category. The payments began only in 2017, well after the *Hinkle* suit commenced. This perhaps conflicts with the letter claim of $47,000 from as early as October of 2016. With due deference to contract breadth, the Court simply cannot adjudge payment propriety with this black box description. To be sure, NAS is entitled to and the Indemnitors must pay the full recoverable Loss. Getting to that number will require additional proof.[13]

---

[12] *See U.S. Fidelity & Guaranty Co.*, 571 S.W.2d at 646 (stating that, where an indemnity agreement provides that "an itemized statement of payments sworn to by an officer of the surety shall be prima facie evidence of the fact and extent of the liability of the indemnitor[,]" the indemnitor may challenge the surety's payments "only by pleading and proving fraud or lack of good faith by the surety").

[13] The Indemnitors, under an agreement such as the GIA, face a hard calculus in proceeding relative to the Bond obligations. In opposing Hinkle, Masonry always was potentially on the hook not only to Hinkle but also to NAS for Bond-related Loss. This is part of the principal-surety dynamic under documents of this type. Thus, Masonry and the other Indemnitors can continue to fight, but the GIA puts most of the battle load onto the Indemnitors. That is the deal they signed up for. The Court does not, at this stage, view the Affidavit and table as sufficiently "itemized" to warrant enforcement as is.

The same analysis applies to the claim for expenses related to GIA enforcement. NAS is entitled to recover what it reasonably spends to enforce the GIA. The Indemnitors so agreed, defining Loss to include "expenses paid in recovering or attempting to recover losses or expenses paid or incurred." DE #1-2 at ¶ 2(h); *see Travelers*, 2009 WL 2969897, at *7 n.6 (citing *United States v. Hardy*, 916 F. Supp. 1385, 1391 (W.D. Ky. 1996)) (discussing the *Hardy* court's award of attorney fees under similar circumstances and "pursuant to a broad indemnification agreement for 'any and all loss, damage, injury . . . resulting directly or indirectly'"); *see also Lyndon Prop. Ins. Co. v. Overby Grain Farms, Inc.*, No. 5:06-CV-80, 2007 WL 1728263, at *3 (W.D. Ky. 2007) (awarding to the surety attorney fees "which the Company shall at any time sustain or incur, for or by reason or in consequence of the Company having become surety on any such bond(s)"). The Court simply defers the precise award for precise proof.

### III. CONCLUSION

Based on the foregoing reasoning, the Court **ORDERS** as follows:

1. The Court **GRANTS** NAS's motion for summary judgment (DE #16) on Count I, to the extent NAS seeks a determination as to liability;

2. The Court **GRANTS** DE #16 insofar as it seeks indemnification for the $64,958.25 *Hinkle* settlement amount;

3. The Court **GRANTS** DE #16, in part, to the extent NAS seeks a determination that Defendants are liable for attorney fees, but **DENIES** DE #16, to the extent NAS seeks a determination as a matter of law regarding the amount of fees owed; and

4. The Court **DENIES** DE #16 as to Counts II and III, which the motion does not discuss.

This the 19th day of November, 2018.



Signed By:
*Robert E. Wier*    REW
**United States District Judge**